UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/24/2014

CHARLES P. LAMBERTI,

                            Plaintiff,

        - against -

MOTOROLA SOLUTIONS, INC., ROBERT
SANDERS, and JESSICA MICCICHE,

                            Defendants.

**MEMORANDUM
OPINION & ORDER**

12 Civ. 2472 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Pro se plaintiff Charles Lamberti brings this action pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.[1]  (Cmplt. (Dkt. No. 1))

Lamberti alleges that his former employer, Motorola Solutions, Inc. ("Motorola" or "the

Company"), his former supervisor, Robert Sanders, and a Motorola human resources

representative, Jessica Micciche, discriminated against him on the basis of his age, race, and

gender, and retaliated against him after he complained about the discrimination.  Defendants

have moved for summary judgment, arguing that Lamberti waived his right to assert these claims

by signing a separation agreement and a general release in exchange for severance payments and

---

[1]  The Complaint states that this action is brought pursuant to Title VII, but it includes allegations
of age discrimination.  (Dkt. No. 1)  Title VII does not prohibit age discrimination.  See
Bornholdt v. Brady, 869 F.2d 57, 62 (2d Cir. 1989) ("Title VII . . . governs complaints relating
only to discrimination on the basis of race, color, religion, sex, or national origin, and not
discrimination on the basis of age.").  Accordingly, the Court will construe the Complaint as
raising claims under the Age Discrimination in Employment Act ("ADEA"), as well as Title VII.
See Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) ("[Courts] must construe pro se complaints
liberally, 'to raise the strongest arguments that they suggest.'") (quoting Green v. United States,
260 F.3d 78, 83 (2d Cir. 2001)).

other benefits.  (Dkt. No. 23)  For the reasons set forth below, Defendants' motion will be granted.

## BACKGROUND

### I.   FACTS

Lamberti began working at Symbol Technologies – which was later acquired by Motorola – in January 1986.  (Def. R. 56.1 Stmt. ¶ 1)[2]  He started as an assembly line worker, but over the next twenty-five years he "worked [his] way up" to Senior Director of Engineering. (Id. ¶ 2)  In that position, eight to ten departments reported to Lamberti, and he managed between 50 and 200 people at various times.  (Id. ¶ 3; Pltf. R. 56.1 Resp. ¶ 3; Oslick Decl. (Dkt. No. 24), Ex. 1 ("Pltf. Dep. Tr.") 39, 41-42)

In September or October 2010, Lamberti alleged that he was being treated unfairly by his superiors at the Motorola office in Holtsville, New York, and he asked the Company to investigate his claims.  (Def. R. 56.1 Stmt. ¶ 9; Pltf. Dep. Tr. 49-50)  Believing that Jessica Micciche, the local Human Resources representative, could not be objective, Lamberti asked Motorola to appoint an "independent third party outside of the business unit he worked in" to conduct the investigation.  (Def. R. 56.1 Stmt. ¶ 10; Pltf. R. 56.1 Resp. ¶ 10; Pltf. Dep. Tr. 47-50)  Motorola assigned Martha Visbal, a Florida-based Human Resources Director, to conduct the investigation.  (Def. R. 56.1 Stmt. ¶ 11)  Lamberti communicated with Visbal via phone and e-mail regarding the investigation.  (Id. ¶¶ 12, 13)

---

[2]  This Court cites to facts drawn from a party's Local Rule 56.1 statement where the opposing party has admitted those facts or has not controverted them with citations to admissible evidence. See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

In November 2010, Visbal notified Lamberti that he was being laid off.  (Id. ¶ 15) In a November 11, 2010 e-mail, Lamberti requested that his last day of work be sometime during the following week, that he be paid through December 31, 2010, and that his severance be paid in a lump sum.  (Pltf. Dep. Tr. 63-64)  Although Lamberti asserts that his requests regarding his last work and pay days were "standard" and "afforded to everyone" (id. at 64-65), Visbal claims that it was "[a]bsolutely not" a common practice at Motorola for laid off employees to remain on the payroll through the end of the quarter, or to be paid for several weeks even though they were not working.  (Def. R. 56.1 Stmt. ¶ 19)

On November 12, 2010, Lamberti was provided with a proposed agreement that would govern the terms of his departure from the Company (the "Separation Agreement"). (Oslick Decl. (Dkt. No. 24), Ex. 6)  The Separation Agreement, in part, states:

> This letter will confirm that your last day of work with Motorola will be November 19, 2010, and that you are eligible to receive the severance payments and benefits provided by the Motorola, Inc. Involuntary Severance Plan ("ISP"). If you sign and do not revoke the General Release, which is part of the ISP, you will receive severance payments that total $85,727.20.  Separate and apart from the severance payments and benefits provided by the ISP, we have agreed that if you sign and do not revoke this Agreement, you will remain on payroll and Motorola benefits until December 31, 2010 and be eligible for your 2010 Motorola Incentive Plan payment.  Please read this letter agreement carefully and return a signed copy to me if you agree with the conditions set forth herein.  If you sign this letter, it will operate as a binding contract between you and Motorola.

(Id.)  In exchange for the severance payments and other benefits referenced in the Separation Agreement, Lamberti agreed to, inter alia, "not file any lawsuit or internal claims or complaints against Motorola or otherwise recover money or other relief from Motorola in any forum."  (Id.)

In the proposed Separation Agreement, Motorola makes clear that (1) the Agreement, if executed by Lamberti, will constitute an enforceable contract; (2) that Lamberti

should consult with a lawyer; and (3) in the event Lamberti signs the Agreement, he will have

seven days to revoke the Agreement:

> If you sign this letter agreement, it will become a legal contract between you and
> Motorola with important consequences for both you and Motorola. Your
> signature will be your acknowledgement that you have freely and voluntarily
> agreed to the terms in this letter and have not been coerced or subjected to any
> duress by Motorola to do so. In addition, your signature will be your
> acknowledgement that you are advised and encouraged, by this writing, to consult
> with an attorney before signing this letter; that you have relied on your own
> judgment regarding the consideration being given for your promises and
> agreements and the language contained in this letter; that you have been given
> sufficient time to consider the terms of this letter; that you have read and
> understand the terms of this letter; that the consideration you are to receive is in
> addition to any you are otherwise entitled to receive; and that no statements made
> by Motorola have in any way coerced or unduly influenced you to sign this letter.
>
> If you sign this letter, you will have seven (7) days afterward to revoke this
> agreement, if you so desire, by notifying Martha Visbal at 8000 West Sunrise
> Blvd., Plantation, FL 33322 within the seven (7) day revocation period.
>
> If this offer is acceptable to you, please sign where indicated below and return it
> to Martha Visbal. Your signature below means you have freely and voluntarily
> agreed to the terms of this letter. If you have any questions, please feel free to
> contact me.

(Id.)

Lamberti signed the Separation Agreement and returned it to Visbal on November

18, 2010. (Def. R. 56.1 Stmt. ¶ 45) He did not exercise his option to revoke the Agreement

within seven days. (Id. ¶ 48)

In accordance with the Separation Agreement, Lamberti received his salary for

the six-week period between November 19, 2010 and December 31, 2010. (Pltf. Dep. Tr. at 79-

80, 82) These payments total $18,000. (Id.) His medical benefits were also continued through

December 31, 2010. (Id. at 91-93)

The "General Release" referenced in the Separation Agreement is a separate

document that Lamberti was required to sign in order to receive severance benefits. (Def. R.

56.1 Stmt. ¶ 30) Lamberti is not certain whether he received a copy of the General Release

before he signed the Separation Agreement. (Pltf. Dep. Tr. 72) Visbal states that she sent

Lamberti a copy of the General Release on November 12, 2010, at the same time that she sent

him the Separation Agreement. (Visbal Decl. (Dkt. No. 25) ¶ 6) It is undisputed that Lamberti

had received a copy of the General Release by January 5, 2011. (Def. R. 56.1 Stmt ¶ 51)

The General Release states:

> I hereby unconditionally and irrevocably release, waive and forever discharge
> Motorola, Inc., Motorola Mobility Holdings, Inc., Motorola Mobility, Inc. and
> their affiliates, parents, successors, subsidiaries, directors, officers, and employees
> ("Motorola"), from ANY and ALL causes of action, claims and damages,
> including attorneys fees, whether known or unknown, foreseen or unforeseen,
> presently asserted or otherwise, which have or could have arisen to date out of my
> employment or separation from employment or any notice regarding my
> separation. This General Release ("Release") includes, but is not limited to, any
> claim or entitlement to pay, benefits or damages arising under any federal law,
> including but not limited to any claim under Title VII of the Civil Rights Act of
> 1964, the Age Discrimination in Employment Act . . . and any claim arising under
> any common law principle or public policy; and any claim under Motorola's
> Human Resources policies. . . .

> I understand by signing this Release I am not releasing any claim or right which
> cannot be waived by law, including the right to file an administrative charge of
> discrimination and the right to file or pursue a workers' compensation claim. . . .

> I am signing this Release knowingly and voluntarily. I acknowledge that: (1) I
> have been advised in writing to consult an attorney before signing this Release;
> (2) I have relied solely on my own judgment and/or that of my attorney regarding
> the consideration for and the terms of this Release; (3) the severance allowance
> and severance benefit provided under the Motorola, Inc. Involuntary Severance
> Plan which I will receive for signing this Release are consideration in addition to
> anything to which I am otherwise entitled; (4) I have been given up to forty-nine
> (49) days to consider this Release, and an additional seven (7) days . . . after
> signing to revoke it in writing; (5) I have read and understand the Release and
> further understand that it includes a general release of any and all known and
> unknown claims to date I may have against Motorola; (6) I agree that if I decide
> to revoke this Release I will notify a designated Employee Relations
> representative at Motorola of such revocation in writing; and, (7) no statements or
> conduct by Motorola have in any way coerced or unduly influenced me to execute
> this Release. . . .

(Oslick Decl. (Dkt. No. 24) Ex. 9)

        Although Lamberti acknowledges that the General Release advises him to consult with an attorney, he testified that he "didn't even consider" doing so, because he did not think that "slowing the process [of receiving his severance pay] [was] something that was feasible." (Def. R. 56.1 Stmt. ¶ 62; Pltf. Dep. Tr. at 119)  The General Release provides Lamberti with up to forty-nine days to sign it.  (Def. R. 56.1 Stmt. ¶ 64)

        On January 5, 2011 – along with a copy of the General Release – Motorola sent Lamberti an "Older Workers Benefit Protection Act List."  (Jensen Decl. (Dkt. No. 33) ¶ 5; Oslick Decl. (Dkt. No. 24), Ex. 10)  The 198-page list set forth "the job titles and ages of all individuals who were selected for the reduction-in-force (and thus were eligible for severance benefits), and a list of individuals in the same organizational unit who were not selected for the reduction-in-force (and thus were ineligible for severance benefits)."  (Def. R. 56.1 Stmt. ¶ 51; Jensen Decl. (Dkt. No. 33) ¶ 5; Oslick Decl. (Dkt. No. 24), Ex. 10)  The list includes a notice with the following information concerning the General Release:

> •     You have 49 days from the date you receive this list to sign and return the General Release to Motorola, which will entitle you to receive the severance allowance and severance benefits afforded under the Motorola Inc. Involuntary Severance Plan.
>
> •     You may sign and return the General Release at any time after you receive this list as long as it is after your last day on payroll and before the expiration of the 49 days.
>
> •     From the date you sign and date the General Release, you will then have an additional seven (7) calendar days . . . to revoke it.  Motorola must receive your revocation in writing by the close of the seven-day . . . period.
>
> •     If you do not revoke the release, the severance allowance will be paid to you once the applicable revocation period ends.

- **NOTE:  YOU MAY NOT MAKE ANY CHANGES TO THE TERMS OF THE GENERAL RELEASE.**

(Oslick Decl. (Dkt. No. 24), Ex. 10) (emphasis in original))

Lamberti signed the General Release and returned it to Motorola on January 12, 2011, long before the deadline had expired.  (Def. R. 56.1 Stmt. ¶ 64; Oslick Decl. (Dkt. No. 24) Ex. 9)  Lamberti testified that he did not take additional time to consider the release because "the longer you wait, the longer it's going to take to resume your payments."  (Pltf. Dep. Tr. 124)  Lamberti did not exercise his right to revoke the release within seven days after signing it.  (Def. R. 56.1 Stmt. ¶ 65; Pltf. Dep. Tr. 123-24)

Lamberti does not dispute that he received the promised severance payments after signing and returning the General Release.  (See Def. R. 56.1 Stmt. ¶ 71; Oslick Decl. (Dkt. No. 24), Exs. 13-14)  In April 2011, Lamberti also received his 2010 Motorola Incentive Plan Payment, which totaled $47,151.68.  (Def. R. 56.1 Stmt. ¶ 27)

Lamberti has not returned – or offered to return – any of the consideration he received for signing the Separation Agreement and the General Release.  (Id. ¶ 71)

## II.     PROCEDURAL HISTORY

On August 23, 2011, Lamberti filed a complaint with the New York State Division of Human Rights ("NYSDHR").  (Cmplt. (Dkt. No. 1) at 7)[3]  In his complaint, Lamberti alleged, inter alia, that: (1) Motorola failed to promote him despite numerous promises to do so; (2) demoted him to a lower pay grade and title even though he performed all required duties of his position satisfactorily; and (3) terminated him when he complained about Motorola's discriminatory practices.  (Id. at 12-19)  In the NYSDHR complaint, Lamberti

---

[3]  The page numbers referenced in this opinion correspond to the page numbers of the Complaint and its exhibits and attachments as displayed on the ECF system.  (Dkt. No. 1)

concedes that he "signed a letter dated November 12, 2010, which provided that he would be placed on an 'Involuntary Severance Plan' and that if he signed and did not revoke an accompanying General Release, he would be paid a severance payment of $85,727.20. . . ." (Id. at 15)

Neither side has submitted a copy of the NYSDHR's decision concerning Lamberti's complaint, but Defendants assert that "[o]n or about January 31, 2012, the NYSDHR issued a finding of 'No Probable Cause' to believe that Motorola [had] engaged in the unlawful discriminatory practices complained of." (Def. Motion to Dismiss Br. (Dkt. No. 9) at 1) Plaintiff has not disputed this assertion.

On March 13, 2012, the Equal Employment Opportunity Commission issued Lamberti a "right to sue" letter. (Cmplt. (Dkt No. 1) at 5)

Lamberti filed his Complaint in this action on April 2, 2012. (Id. at 1) On May 22, 2012, Defendants moved to dismiss, arguing that "Plaintiff conclusively waived his right to bring this lawsuit" by signing the Settlement Agreement and General Release. (Dkt. Nos. 8, 9) On January 15, 2013, this Court denied Defendants' motion, finding that "[o]n the present record, [it could not] conclude as a matter of law that Lamberti's execution of the Settlement Agreement and Release was 'knowing and voluntary.'" Lamberti v. Motorola Solutions, Inc., No. 12 Civ. 2472(PGG), 2013 WL 166367, at *6 (S.D.N.Y. Jan. 16, 2013).

On February 14, 2013, this Court entered a Case Management Plan which provided that discovery would proceed in two phases. (Case Management Plan (Dkt. No. 18) ¶ 5) The first phase was limited to issues relevant to the validity and enforceability of the Separation Agreement and General Release. (Id.)

On August 5, 2013, after the first phase of discovery was complete, Defendants moved for summary judgment. (Dkt. No. 23) Defendants assert that the record demonstrates that Lamberti executed the Separation Agreement and General Release knowingly and voluntarily, and that his waiver of claims entitles Defendants to summary judgment. (Def. Br. (Dkt. No. 28))

## DISCUSSION

## I.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). However, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotations and citations omitted). Instead, the non-moving party must "offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

## II.    VALIDITY OF RELEASE

### A.    Applicable Law

"The essential inquiry in determining the validity of a release of a claim brought pursuant to the federal civil rights statutes – other than the Older Worker's Benefit Protection Act (the "OWBPA") – is whether, considering the 'totality of the circumstances,' the individual's waiver of his or her right can be characterized as 'knowing and voluntary.'" Laramee v. Jewish Guild for the Blind, 72 F. Supp. 2d 357, 359 (S.D.N.Y. 1999) (quoting Bormann v. AT & T Commc'ns, Inc., 875 F.2d 399, 402-03 (2d Cir. 1989)). "[T]he validity of a release is a peculiarly fact-sensitive inquiry." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437-38 (2d Cir. 1998). "In determining whether under the totality of the circumstances an individual's waiver was knowing and voluntary, the following factors must be considered:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, [and] (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law. . . .

Laramee, 72 F. Supp. 2d at 359-60 (citing Bormann, 875 F.2d at 403).

"[A] purported waiver of ADEA claims is . . . governed by the Older Workers Benefits Protection Act, 29 U.S.C. § 626(f)," Tung v. Texaco, Inc., 150 F.3d 206, 208 (2d Cir. 1998), which states that "an individual may waive his rights only if the waiver is 'knowing and voluntary.'" Powell v. Omnicom, 497 F.3d 124, 131 (2d Cir. 2007) (citing 29 U.S.C. § 626(f)(1)). "Section 626(f) provides specific statutory requirements for a 'knowing and voluntary' waiver that the employer must meet in order

for an employee to waive his ADEA claims.'" Id. (citing Tung, 150 F.3d at 209).  A

waiver will not be considered "knowing and voluntary" under Section 626(f)(1) unless:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired.
>
> (H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to—
>
>> (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and
>>
>> (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).

B.      **Analysis**

In signing the General Release, Lamberti explicitly released all claims against "Motorola, Inc. . . . and [its] affiliates, parents, successors, subsidiaries . . . and employees . . . including but not limited to any claim under Title VII of the Civil Rights Act of 1964 [and] the Age Discrimination in Employment Act. . . ." (Oslick Decl. (Dkt. No. 24), Ex. 9)  Given that the General Release covers the Defendants and the claims Plaintiff has brought, the only remaining question is whether – under the totality of the circumstances – the General Release is valid and enforceable.

1.      **Education and Business Experience**

Lamberti received his GED when he was fifteen or sixteen years old, and he has taken some college courses.  (Pltf. Dep. Tr. 25; Pltf. Br. (Dkt. No. 31) at 6)  By the end of his twenty-five year career at Symbol Technologies and Motorola, Lamberti was a "senior executive with a strong track record of leading operations in product development for a $1.6 billion technology manufacturing organization." (Def. R. 56.1 Stmt. ¶ 5)  His "expertise include[d] overall business leadership, new product design and development, ISO certification, engineering regulatory compliance, project management, product launch, logistics, and business process reengineering."  (Id. ¶ 6)  Lamberti had eight to ten departments reporting to him, and he managed between 50 to 200 people at various times.  (Id. ¶ 3; Pltf. R. 56.1 Resp. ¶ 3; Pltf. Dep. Tr. 39, 41-42)  His base salary at the time of his termination was between $160,000 and $165,000.  (Pltf. Dep. Tr. 79)

Lamberti's lengthy career at Motorola and its predecessor, the management position he occupied, and the scope of his responsibilities, strongly suggest that his execution of the Separation Agreement and General Release was knowing and voluntary.  See, e.g., Campbell

v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 240 (S.D.N.Y. 2000) ("The first factor . . . cuts in

favor of finding a knowing and voluntary waiver. [Plaintiff] is a high school graduate who has

attended college but has not received a degree. . . . Moreover, she held a managerial position at

[the company]."); Reid v. IBM Corp., No. 95 Civ. 1755 (MBM), 1997 WL 357969, at *5

(S.D.N.Y. June 26, 1997) ("[P]laintiff's education and business experience – business studies in

high school and community college, and 10 years of managerial experience at IBM – is sufficient

to warrant the inference that he understood the Release."); Nicholas v. Nynex, Inc., 929 F. Supp.

727, 731 (S.D.N.Y. 1996) ("[Plaintiff] is a high school graduate who has completed subsequent

training in computer programming. . . . At the time he was terminated, plaintiff occupied a

management position at [the company] and was responsible for leading teams of programmers

on particular projects. . . . His education and business experience certainly indicate that he is

capable of understanding this release.").

### 2.      Time to Consider the Agreements

Lamberti acknowledges that the Separation Agreement and General Release

"state certain time frames for consideration," but he argues that "the record shows that [he]

signed them hastily[ ] (6 days and 2 days)." (Pltf. Br. (Dkt. No. 31) at 7; see also Def. R. 56.1

Stmt. ¶ 45)  The Separation Agreement contains no deadline for execution, while the General

Release provides Lamberti with "up to forty-nine (49) days to consider it" before signing.  (Def.

R. 56.1 Stmt. ¶ 64; Oslick Decl. (Dkt. No. 24), Exs. 6, 9)  Each agreement also provides for an

additional seven-day revocation period after signing.  (Oslick Decl. (Dkt. No. 24), Exs. 6, 9; Def.

R. 56.1 Stmt. ¶¶ 58, 65)  Courts in this District have found shorter time periods sufficient to

support a knowing and voluntary waiver.  See, e.g., Kramer v. Vendome Grp. LLC, No. 11 Civ.

5245 (RJS), 2012 WL 4841310, at *3 (S.D.N.Y. Oct. 4, 2012) (quoting Cordoba v. Beau Dietl &

13

Assocs., No. 02 Civ. 4951 (MBM), 2003 WL 22902266, at *5 (S.D.N.Y. Dec. 8, 2003)) ("In this district, courts have concluded that four days is sufficient time for a plaintiff 'to acquaint [himself] with [a r]elease's terms and make a considered decision.'").  The time periods Lamberti was provided to consider the Separation Agreement and General Release weigh in favor of finding that his waiver was knowing and voluntary.

> ### 3.   Role in Negotiating the Agreements' Terms

Plaintiff contends that Motorola "did not offer [him] the chance to negotiate anything" and that he "made several requests which were denied."  (Pltf. Br. (Dkt. No. 31) at 3) Motorola argues that Lamberti was allowed to select his last work and pay days, a choice not commonly given to terminated employees.  (Def. R. 56.1 Stmt. ¶ 19)  Given this dispute, and the fact that the OWBPA notice sent with the General Release states that Lamberti "may not make any changes to the terms of the General Release" (Oslick Decl. (Dkt. No. 24), Ex. 10), this Court concludes that this factor weighs against finding that the waiver was knowing and voluntary.

> ### 4.   Clarity of the Agreement

Lamberti states that although he does not "debate what the [S]eparation [A]greement states or [his] understanding of it at the time of [his] deposition[,] [what he does] debate and what is at issue here is [his] understanding and the circumstances at the time [he] signed it." (Pltf. Br. (Dkt. No. 31) at 5)  Lamberti claims that – when he signed the Separation Agreement – he "did not understand what rights [he] was being asked to waived . . . [or] that there would be follow-[up] documents that [he] would be required to sign." (Pltf. Dep. Tr. 70)

The language of the Separation Agreement, however, is clear on both points.  The Agreement expressly lists – in enumerated paragraphs written in plain English – the rights Lamberti will be giving up if he signs the Agreement.  (See Oslick Decl. (Dkt. No. 24), Ex. 6)

The Agreement also makes clear that, in order to obtain the severance payment described in the Agreement, Lamberti will have to sign and not revoke the General Release. See id. ("If you sign and also do not revoke the General Release, which is part of the [Involuntary Severance Plan], you will receive severance payments that total $85,727.20."). The Separation Agreement goes on to provide that, "[s]eparate and apart from the severance payments and benefits provided by the ISP, we have agreed that if you sign and do not revoke this [Separation] Agreement, you will remain on payroll and Motorola benefits until December 31, 2010 and be eligible for your 2010 Motorola Incentive Plan payment." (Id. (emphasis added)) The Separation Agreement thus makes clear that Lamberti is eligible for two separate sets of benefits – (1) benefits under the ISP, including severance payments; and (2) continuation of existing pay and benefits until December 31, 2010 – and that he will be required to sign and not revoke different documents in order to obtain each set of benefits.

The General Release likewise lists the legal rights Lamberti will give up by signing the release. (See id., Ex. 9) The surrendered rights listed include the right to pursue claims under Title VII and the ADEA – claims that Lamberti is pursuing in this litigation.

The clarity of the Separation Agreement and the General Release weigh in favor of finding that Lamberti's waiver was knowing and voluntary. See Kramer, 2012 WL 4841310, at *4 (finding waiver where "the Release stated – in plain English that would be clear to a layperson – that upon signing the Release, Plaintiff would 'waive and release . . . all claims or charges that [Plaintiff has] or might have against [Defendant, including] . . . claims for discrimination arising under . . . the American[s] with Disabilities Act'") (emphasis omitted).

5.     **Opportunity to Consult with an Attorney**

In executing the Separation Agreement and the General Release, Lamberti acknowledges that he has been "advised in writing to consult an attorney before signing [these documents]." (Oslick Decl. (Dkt. No. 24), Exs. 6, 9)  Plaintiff did not follow that advice.  (Pltf. Dep. Tr. 68-69, 118)  With respect to the General Release, Lamberti states that he "didn't even consider" consulting an attorney before signing it, because he did not believe that "slowing the process [of receiving his severance pay] [was] something that was feasible."  (Def. R. 56.1 Stmt. ¶ 62; Pltf. Dep. Tr. 119)

"Courts in this district have held that a release's encouragement to consult with an attorney weighs in favor of the agreement's enforceability."  Kramer, 2012 WL 4841310, at *4. Lamberti's decision that quick receipt of severance pay was more important than obtaining a lawyer's advice does not alter the fact that he was advised to consult a lawyer before signing the Separation Agreement and General Release.  Moreover, Lamberti does not contend that Defendants discouraged him from seeking a lawyer's advice.  See Bachiller v. Turn On Products, Inc., No. 00 Civ. 8701 (JSM), 2003 WL 1878416, at *4 (S.D.N.Y. Apr. 14, 2003) ("The Notice accompanying the Release clearly advises Plaintiff of [his] right to consult an attorney and Plaintiff does not allege that Defendants discouraged [him] from obtaining an attorney.").  This factor weighs in favor of finding that the waiver was knowing and voluntary.

6.     **Consideration for the Agreements**

In evaluating the consideration that an employee receives for signing a release, courts look to whether the consideration exceeds what "the employee was already entitled [to] by contract or law."  Bormann, 875 F.2d at 403; see also 29 U.S.C. § 626(f)(1)(D).  When asked at his deposition whether Motorola had the right to terminate his employment at any time, Lamberti

stated that he did not know, but he admitted that he "did not have an executive level employment contract" with the Company and was not a member of a union. (Pltf. Dep. Tr. 75-76) This testimony indicates that Plaintiff understood that he had no contractual right to the payments he received after his termination. Moreover, Plaintiff has offered no contrary evidence.

Indeed, Lamberti acknowledges that he received approximately six weeks' salary – $18,000 – "in exchange for" signing the Separation Agreement, and he concedes that his execution of the General Release led him to receive more severance pay than he was otherwise entitled to receive. (Pltf. Dep. Tr. 80, 126) These payments weigh in favor of finding that Lamberti's waiver was knowing and voluntary. See Bachiller, 2003 WL 1878416, at *3 ("Plaintiff executed the Release in exchange for severance pay, compensation to which she was not otherwise entitled.").

Plaintiff nonetheless argues that he did not receive more than he was entitled to from Motorola because (1) Defendants had already determined – prior to notifying him of his termination – when his last work and pay days would be, and (2) the benefits he was given were "common practice packaged in the form of an agreement." (Pltf. Br. (Dkt. No. 31) at 4, 7) These arguments are unavailing.

In support of his first argument, Plaintiff cites to two spreadsheets from Motorola that list his last work and pay days. (See Oslick Supp. Decl. (Dkt. No. 30), Exs. A, B) Lamberti claims that these documents demonstrate that Motorola "preplanned" these dates. (Pltf. Br. (Dkt. No. 31) at 3-4) Plaintiff acknowledges, however, that "the creation date of these documents" is not reflected in the record. (Id. at 3) Accordingly, they do not support his argument that these dates were "preplanned." Even assuming arguendo that Defendants had planned in advance to offer Plaintiff six weeks of pay and benefits, this does not change the fact that Lamberti received

these benefits in exchange for signing the Separation Agreement.  Since Motorola conditioned the benefits it offered Lamberti on his execution of the Separation Agreement and General Release, Motorola could have denied Lamberti the benefits it intended to give him had he refused to sign.

Moreover, even if it was "common practice" for Motorola to offer terminated employees a similar severance package, this does not establish that Lamberti was "entitled" to such a package.  As noted above, Lamberti admits that he received more compensation than he otherwise would have received had he not signed the agreements.  It also appears that Motorola employees who are terminated due to a reduction-in-force are routinely required to sign the General Release in order to receive severance benefits.  (See Jensen Decl. (Dkt. No. 26) ¶ 3; Oslick Decl. (Dkt. No. 9), Ex. 9)  In sum, Lamberti has not demonstrated that he was otherwise entitled to the benefits he received.

### 7.    Undue Influence and Economic Duress

Lamberti also claims that he signed the Separation Agreement and General Release under "economic duress" and only as a result of Visbal's "undue influence."  (Pltf. Br. (Dkt. No. 31) at 7)  As to the Separation Agreement, Lamberti states that he was feeling "economic" pressure because he needed the financial benefits it provided.  (Def. R. 56.1 Stmt. ¶ 45)  As to the General Release, Lamberti claims that he signed it because his salary "payments were halted in January 2011 to apply economic pressure . . . to secure [his] signature on a release."  (Pltf. Br. (Dkt. No. 31) at 7)

"Undue influence" and economic duress are not listed in Bormann or Section 626(f) as factors to be considered in determining the enforceability of a release.  The factors listed in these authorities are not exhaustive, however.  See Bormann, 875 F.2d at 403 ("The list

is obviously not exhaustive. . . ."); <u>Johnston v. Carnegie Corp. of N.Y.</u>, No. 10 Civ. 1681 (PAC)

(DF), 2011 WL 1118662, at *3 (S.D.N.Y. Mar. 23, 2011) (considering, along with <u>Bormann</u>

factors, Plaintiff's undue influence and duress claims in denying motion to dismiss on the basis

of a release). Accordingly, this Court will consider whether Lamberti's waiver was obtained

through duress or undue influence.

"Courts in the Second Circuit . . . recognize economic duress. . . . [where an]

'agreement was obtained:  (1) by means of wrongful threat precluding the exercise of free will;

(2) under the press of financial circumstances; [and] (3) where circumstances permitted no other

alternative.'" <u>Joseph v. Chase Manhattan Bank, N.A.</u>, 751 F. Supp. 31, 35 (E.D.N.Y. 1990)

(quoting <u>Nelson v. Stanley Blacker, Inc.</u>, 713 F. Supp. 107, 110 (S.D.N.Y. 1989)).  Undue

influence is a type of duress. <u>Id.</u> at 34.  A duress claim "is evaluated according to an objective

standard." <u>Mathias v. Jacobs</u>, 167 F. Supp. 2d 606, 614 (S.D.N.Y. 2001).

"[I]n a contract dispute like this one, the duress at issue must have originated from

the defendant." <u>Mandavia v. Columbia Univ.</u>, 912 F. Supp. 2d 119, 127 (S.D.N.Y. 2012).

"Indeed, to constitute duress, a defendant's actions must have amounted to 'threats that

preclude[d] the exercise of [a plaintiff's] free will.'" <u>Kramer</u>, 2012 WL 4841310, at *6 (quoting

<u>Reid</u>, 1997 WL 357969, at *7) (alterations in original).  "[A] mere demonstration of financial

pressure or unequal bargaining power will not, by itself, establish economic duress."

<u>Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n</u>, 655 F.3d 136, 142 (2d Cir. 2011).

"Even construed liberally, Plaintiff's description of [Motorola's] behavior falls far

short of economic duress." <u>See Mandavia</u>, 912 F. Supp. 2d at 128.  Conduct much more

oppressive than that at issue here has been found to fall short of duress. <u>See</u>, <u>e.g.</u>, <u>id.</u>

("Columbia's refusal to schedule meetings, disinterest in hearing [plaintiff's] grievances, and

generally hostile attitude in negotiations simply do not constitute wrongful threats sufficient to override a person's free will.").  Moreover,

> [a]lthough Plaintiff alleges that [he] felt "compelled to take advantage of [Defendants'] offer" while [he] "had the chance" . . . the circumstances did permit alternatives, including pursuing legal remedies. . . . Plaintiff['s] assertion that "the pressure to obtain [benefits] was duress" . . . conflates [his] need for the severance benefits . . . and improper pressure from Defendant.  That Plaintiff may have felt pressure to sign the Release given [his] financial constraints . . . is understandable.  However, that pressure, when not caused by Defendant[s], is insufficient to prove duress.

Kramer, 2012 WL 4841310, at *6 (emphasis in original).

Here, the "duress" that Lamberti alleges is, in reality, the pressure of his own financial circumstances, and not the result of improper action by Defendants.  The fact that Defendants stopped making salary payments to Lamberti at the beginning of January 2011 does not demonstrate "improper pressure" by Defendants.  Instead, it reflects the fact – acknowledged by Lamberti at his deposition – that under the terms of the Separation Agreement his employment at Motorola had ended.  (Plt. Dep. Tr. 104)  "Plaintiff invokes the magical word 'duress,' but in so doing he merely states a legal conclusion unsupported by enough facts to cross the line into the realm of the plausible."  Mandavia, 912 F. Supp. 2d at 129.

### 8. Additional Requirements for ADEA Claims

In addition to the factors discussed above, a waiver of ADEA claims must comply with the statutory requirements of the OWBPA, 29 U.S.C. § 626(f)(1).  It is undisputed that the General Release – which contains the ADEA waiver – "specifically refers to rights or claims arising under" the ADEA.  29 U.S.C. § 626(f)(1)(B); (Def. R. 56.1 Stmt. ¶ 56)  As the Court previously stated – in evaluating the clarity of the General Release – it was "written in a manner calculated to be understood by [Lamberti], or by the average individual eligible to participate" in Motorola's involuntary severance plan.  29 U.S.C. § 626(f)(1)(A).

20

Lamberti also "waive[d] [his] rights or claims . . . in exchange for consideration in addition to anything of value to which [he was already] entitled," and he was "advised in writing to consult with an attorney prior to executing the agreement." Id. § 626(f)(1)(D)-(E). The General Release provided Lamberti with "a period of at least 45 days within which to consider the agreement," and "an additional seven (7) days . . . after signing to revoke it in writing." Id. § 626(f)(1)(F)-(G). By its terms, the waiver only applied to Lamberti's "claims to date" against Motorola, and did not "waive rights or claims that [might] arise after the date the waiver [was] executed." Id. § 626(f)(1)(C); (see Oslick Decl. (Dkt. No. 24), Ex. 9) Finally, Plaintiff does not dispute that Motorola's OWBPA list satisfies the requirements of 29 U.S.C. § 626(f)(1)(H). (Def. R. 56.1 Stmt. ¶ 22; see Oslick Decl. (Dkt. No. 24), Ex. 10) Although Plaintiff states that he "cannot confirm or deny" that he received the OWBPA list[4] (Pltf. Dep. Tr. 113), Defendants have provided evidence that the list was, in fact, sent to him on January 5, 2011. (Jensen Decl. (Dkt. No. 26) ¶¶ 4-5) The requirements of the OWBPA are satisfied here.

*        *        *        *

"The factors [governing the knowing and voluntary determination] overwhelmingly weigh in favor of the [D]efendants. Although [P]laintiff did not consult an attorney and [may have] played [little or] no role in drafting or negotiating the terms of the Agreement and Release, 'not every factor must be in the defendant[s'] favor for the release to be found knowing and voluntary.'" Figueroa v. MRM Worldwide, No. 12 Civ. 4115 (HBP), 2014 WL 902953, at *9 (S.D.N.Y. Mar. 7, 2014) (quoting Drees v. Cnty. of Suffolk, No. 06-CV-3298 (JFB) (ETB), 2009 WL 875530, at *3 (E.D.N.Y. Mar. 30, 2009)). Having considered all of the

---

[4] Lamberti's deposition testimony was equivocal on this point. He stated that he did not recall receiving the OWBPA list, but he acknowledged that he might have received it in a more compressed form. (Pltf. Dep. Tr. 112-14)

factors and the totality of the circumstances, this Court concludes that Lamberti signed the

Separation Agreement and General Release knowingly and voluntarily.  Accordingly, his waiver

of claims against Motorola is valid and enforceable.[5]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is

granted.  The Clerk of Court is directed to terminate the motion (Dkt. No. 23), to mail a copy of

this order by certified mail to pro se plaintiff Charles P. Lamberti, 135 Howard Street, Port

Jefferson Station, New York 11776-2519, and to close this case.

Dated: New York, New York
       March 24, 2014                    SO ORDERED.

                                         _____
                                         Paul G. Gardephe
                                         United States District Judge

---

[5]  Even if the Separation Agreement and General Release were voidable – which they are not – Lamberti ratified these contracts by accepting and maintaining the benefits he received under each.  Lamberti has not "tendered back (or offered to tender back) any of the consideration he received for signing either the Separation Agreement or the General Release."  (Def. R. 56.1 Stmt. ¶ 71)  Accordingly,

> any claim that the [Separation] Agreement [and General Release are] voidable in [2014] due to unconscionability or economic duress [Lamberti] suffered from in [2010 and January 2011] must fail because [he] did not act at all, let alone "promptly," to revoke the [Separation] Agreement [and General Release], or to return the consideration [he] received because [he] signed the Agreement [and Release].

Pallonetti v. Liberty Mut., No. 10 Civ. 4487, 2011 WL 519407, *6 (S.D.N.Y. Feb. 11, 2011). Because the ADEA waiver in the General Release complies with the requirements of the OWBPA, Lamberti's ratification of the waiver extends to those claims as well.  See id. ("The OWBPA does not prevent ratification of a waiver of ADEA claims when the release in question satisfies the statute's minimum requirements for a knowing and voluntary release.").